**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

DOROTA ("GIGI") TOPOREK,

Plaintiff,

v.

R. R. DONNELLEY & SONS COMPANY,

Defendant.

Civil No. 24-8 (JRT/DJF)

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION TO EXCLUDE**

---

Bradley A. Kirscher and Michael C. Mahoney, **MAHONEY KIRSCHER LLC**, 125 West Lake Street, Suite 201, Wayzata, MN 55391, for Plaintiff.

Emily A. McNee and Stephanie Huisman, **LITTLER MENDELSON, P.C.**, 1300 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, for Defendant.

Defendant R.R. Donnelley & Sons Company ("RRD") terminated Plaintiff Dorota "Gigi" Toporek's employment contract as a Sales Representative. Toporek brings this case alleging that RRD breached the parties' employment contract and violated several Minnesota statutes by failing to pay her the full amount of her earned commissions on a major sale, and then terminating her employment after she attempted to obtain the commissions she believed she was owed. RRD seeks summary judgment on all twelve counts brought by Toporek, and also moves to exclude certain expert witness testimony. After careful review, the Court will grant in part and deny in part RRD's Motion for Summary Judgment and will deny RRD's Motion to Exclude Expert Testimony.

**BACKGROUND**

I.   **FACTS**

   **A.  The Pearson Project, the Plan, and the Commission Rate**

   Toporek began working as a sales representative for RRD in September 2018.  (Am. Compl. ("Compl.") ¶ 11, Apr. 1, 2024, Docket No. 13.)  RRD is "one of the largest printers of materials in the United States."  (*Id.* ¶ 4.)  In May 2021, Toporek signed a new "Sales Compensation Plan" (the "Plan").  (*Id.* ¶¶ 12–14; *see also* Decl. of Emily A. McNee in Supp. Def.'s Mot. Exclude Pl.'s Expert ("First McNee Decl."), Ex. 5 (Sales Compensation Plan ("Plan")), Aug. 25, 2025, Docket No. 70-1.)  The Plan established Toporek's compensation structure, her payment schedule, and specified that she would be compensated primarily through commission.  (S*ee id.*)  Regardless of any commission earned, the Plan provided that Toporek would be paid a minimum monthly "draw."  (*See id.* at 10.)[1]  The Plan set the commission rates for "Inside Platform Rates" for "New Clients Commission" at 18% for "Year 1" and 12% for "Year 2."  (Compl. ¶ 19; Plan at 16.) The plan also specified in a section entitled "Modifiers":

---

[1] Page citations are to pagination assigned by the court's CM/ECF system, appearing in a document's upper right corner, not to a document's original pagination, except for depositions, which are cited according to their internal page numbers.

   In future filings and memoranda, the Court urges the parties to cite to record evidence in a way that facilitates the efficient and thorough verification of the parties' assertions.  Citations to a specific docket number entry are strongly encouraged.

> In the sole discretion of Sales Management, Commission Modifiers may be applied periodically to increase or decrease the final commission of particular products or programs.

(Plan at 18.)  The Plan clarifies the function of these "modifiers" under the header "Special Rate ECP's"[2]:

> Certain [account numbers] that Sales Management decides need a special rate, may be added to a table in ICM [the compensation management platform].  The Special Rate will be applied until Sales Management decides the Account may be removed from the table.  The Special Rate may be adjusted through the year in Sales Management's sole discretion.  The Special Rate will be the only rate used if the [account number] is included in the table and will not have any commission modifiers applied or steps in the tiers applied.  Sales Management will notify the Participant prior to an Account being put in this table.

(*Id.* at 18–19.)

A core dispute in this case is what level of commission Toporek is owed under the Plan for a significant sales agreement Toporek secured with Pearson Education, Inc. ("Pearson") in 2022.  (Compl. ¶¶ 20–22.)  On September 30, 2021, as she was working to secure the Pearson deal, Toporek offered to take a reduced commission rate of 10% to lower the price to close the deal; it does not appear from the record that this rate was officially agreed upon.  (Decl. of Emily A. McNee in Supp. Mot. Summ. J. ("Second McNee

---

[2] "ECP means the number assigned to an Account" in RRD's internal shipping system (WCSS) and compensation management systems ("ICM") and is specific to a Sales Representative.  (Plan at 10; *see also* Decl. of Emily A. McNee in Supp. Mot. Summ. J. ("Second McNee Decl."), Ex. 38, Dep. of Jeana Agee ("Agee Dep.") at 35:15–20, 125:22–24, Docket No. 87-4.)

Decl."), Ex. 14, Aug. 26, 2026, Docket No. 97-1 at 3.)  After the Pearson deal became final, Michael Snyder, the President of the RRD plant and Toporek's then-supervisor, confirmed that the Pearson account would "be considered as a new customer[,]" and communicated to her that the commission rate would be determined after further review.  (Second McNee Decl., Ex. 15, Docket No. 85-1 at 2; *id.*, Ex. 32 (Dep. of Michael Snyder ("Snyder Dep.")) at 123:2–24, Docket No. 86-5.)  Snyder said in February 2022 that it was a "collective decision" not to pay Toporek the presumptive 18% commission on the Pearson project.  (Snyder Dep. at 73:7–11.)  RRD instead decided to pay Toporek a commission rate of 9% for the first year.  (*See* Second McNee Decl., Ex. 55, 30(b)(6) Dep. of Jeana Agee ("30(b)(6) Dep.") at 90:6–14, Docket No. 91-2; Snyder Dep. at 84:6–18.)

RRD's internal compensation management system first reflected a change in Toporek's commission rate from 18% to 12%.  (Second McNee Decl., Ex. 38, Dep. of Jeana Agee ("Agee Dep.") at 35:17–20, 215:21–216:13, Docket No. 87-4.)  Ultimately, the commission rate was adjusted to 9%.  (*Id.* at 220:6–221:2; Second McNee Decl., Ex. 1, Dep. of Dorota "Gigi Toporek" ("Toporek Dep.") at 70:11–12, Docket No. 83.)  However, Toporek is still unsure of the rate she was paid, and she has filed an expert report assessing that she was underpaid, even assuming that 9% was the appropriate rate. (Toporek Dep. at 70:11–70:23; *see generally* First Decl. of Emily McNee, Ex. 2 ("Cobb Rep."), Aug. 25, 2025, Docket No. 67-2.)

In June 2022, Toporek first told RRD that she believed she was owed 18% commission under the Plan; she also submitted a written demand to that effect in August 2022.  (Toporek Dep. 74:15–75:19.)  Toporek alleges RRD never formally notified her of the commission rate change, as she claims is required by the Plan.  (Decl. of Dorota "Gigi" Toporek ("Toporek Decl.") ¶ 7, Sept. 15, 2025, Docket No. 117; *see also* Plan at 18–19 ("Sales Management will notify the Participant prior to an Account being put in this [special rate] table.").)  Additionally, there is no evidence suggesting that the Pearson account was moved to any special rate table, another procedural step discussed in the plan.  (Toporek Decl. ¶ 14; *see also* Plan at 18–19.)  The parties agree that RRD deviated from the presumptive commission rate, and Snyder states that Toporek was paid under a "special rate ECP."  (Snyder Dep. at 74:11–14.)

Toporek's earnings statements from RRD labeled her commission as "Commission (Annualized)" with a dollar amount under the heading "Earnings," but the statement did not specify how the amount was determined.  (Toporek Decl. ¶ 15.)  Toporek requested, but did not receive, clarification about these statements.  (*Id.* ¶ 17.)

**B.  Termination of Employment**

From 2018 to 2021, Toporek failed to meet her annual sales quotas.  (Second McNee Decl., Ex. 53, Dep. of James Hoffoss ("Hoffoss Dep.") at 31:9–11, Docket No. 91-1.)  In August 2021, Snyder, Toporek's then supervisor, met with her to discuss her sales performance; another executive had advised Snyder to consider using a "formal written

process with firmly defined milestones" to assist Toporek.  (*See* Second Decl. of Emily McNee in Supp. Mot. Summ. J. ("Third McNee Decl."), Ex. 1 (Decl. of Michael Snyder ("Snyder Decl.")) ¶ 2, Sept. 29, 2025, Docket No. 128-1.)  From November 2021 through June 2022, Toporek's superiors engaged in ongoing discussions regarding Toporek's performance and behavior, including her failure to communicate during the ongoing Pearson project.  (*See* Agee Dep. at 102:19–103:24, 109:14–20, 110:23–25; Snyder Dep. at 139:15–140:3.)  In October 2022, Snyder sent Toporek a quarter-by-quarter breakdown of her sales for the year, which showed that she was "negative in sales" in the third quarter of 2022.  (Toporek Dep. at 165:25–166:5.)

On December 1, 2022, Snyder informed Toporek that RRD had decided to pay her at a commission rate of 7% for "Year 2" on the Pearson project rather than the 12% set forth in the Plan.  (Snyder Dep. at 230:2–4; *see also* Plan at 16.)  Toporek rejected this rate in an email to Snyder on January 31, 2023—she stated, "Per the Comp Plan dated April 1st, 2020, I am entitled to 18% on the first year and 12% on the second year . . .  The rate you have listed is not in conformance with . . . the plan. . . .  I am insisting on being treated fairly and as promised."  (Decl. of Bradley A. Kirscher Opp. Def.'s Mot. Summ. J. ("Kirscher Decl."), Ex. A, Sept. 15, 2025, Docket No. 120-1 at 5.)  Snyder forwarded this email to Jeana Agee, Snyder's supervisor, stating, "I tuned her out at 'entitled.'  This e-mail enrages me[.]"  (*Id.* at 4.)  Agee responded, "How many times do we need to go through this?  I can pull all the same info I did in the past that it's solely up to the president of the

facility . . . to change the [commission rate]." (*Id.*)  Later that day, Snyder responded that "[i]f I had my way, she'd be long gone" (*id.* at 3), and the next day, February 1, 2023, Snyder wrote to other company executives that "we are now going to take firm, yet fair measures to manage Gigi Toporek out of the business.  She's been disruptive for too long, and I have exhausted every ounce of patience." (*Id.* at 2.)

Randy Teigland, the Operations Manager of Facilities and Maintenance at RRD's Chanhassen plant, described Snyder as frequently complaining about Toporek and saying he was "fed-up" with her asking for her commissions and going to "teach her a lesson." (Toporek Decl., Ex. D ("Teigland Decl.") ¶¶ 2–3, 12–13, Docket No. 117-1 at 6.)  Teigland also overheard Snyder "complaining that [Toporek's] full commission was cutting into his personal bonus" and that he was cutting her commission so that his "incentive bonus was not reduced." (*Id.* ¶ 14.)

In February 2023, Hoffoss[3] presented Toporek with a "Memorandum of Understanding" that detailed Toporek's "negative attitude" and her "unsatisfactory [sales] prospecting activities"—but Toporek refused to sign.  (Kirscher Decl., Ex. C, Docket No. 120-1 at 12; Toporek Decl. ¶ 17.)  On March 3, 2023, Hoffoss "presented [Toporek] with her '2nd Notice of Unsatisfactory Performance'" due to her "negative attitude" and

---

[3] From December 5, 2022, to August 2023, Toporek's direct supervisor was James Hoffoss. (Hoffoss Dep. at 15:15–20, 12:20–21.)

"low levels of [sales] prospecting activities." (Second McNee Decl., Ex. 47, Docket No. 88-4 at 2.)

In March 2023, Toporek approached Hoffoss regarding an account that she believed another employee at RRD was trying to steal from her. (Second Decl. of Emily McNee, Ex. 61 (Decl. of James Hoffoss ("Hoffoss Decl.") ¶ 3, Docket No. 109-5 at 2; Hoffoss Decl. ¶ 6 & Ex. 1, Docket No. 113 at 2.) Hoffoss characterized these actions as an attempt by Toporek to "incite [Hoffoss] to action against [the other employee] and his team with highly inaccurate, accusatory, and inflammatory statements[.]" (Hoffoss Decl., Ex. 1, Docket No. 113 at 2.) On March 15, 2023, in an email, Hoffoss asked Matthew Mason, RRD's Regional Human Resources Manager, "[a]m I permitted to terminate [Toporek's] employment this week?" (*Id.* at 3.)

On March 17, 2023, Hoffoss informed Toporek that he was concerned about her activities copying documents and removing them from the office. (Toporek Dep. at 188:2-16.)[4] Then, in July 2023, Toporek organized a call with a prospective client at a company that was already a customer of another RRD sales representative (Hoffoss Dep. at 43:9–24, 48:13–49:20), which Hoffoss characterized as "jeopardiz[ing] existing business" (*id.* at 47:20–25; Second McNee Decl., Memo to File, Docket No. 101-5 at 2.)

---

[4] RRD discovered more evidence of Toporek's copying and retention of RRD documents during the course of litigation, which it asserts was in violation of its internal policies. (*See* RRD's Mem. Supp. Mot. Summary Judgment at 16, Aug. 25, 2025, Docket No. 80 (citing 30(b)(6) Dep. at 157:1-160:20).)

On August 1, 2023, Toporek's employment with RRD was terminated. (Toporek Dep. at 197:11–198:9.)  RRD documented this decision in a "Memo to File" in Toporek's employment record.  (Memo to File, Docket No. 101-5 at 2.)  This document described Toporek as "misrepresent[ing] her justifications" for pursuing a client at an existing customer, noted Toporek's failure to achieve sales goals, and concluded that her "unsatisfactory [sales] prospecting activities and job performance" resulted in her termination.  (*Id.*)

### C.  Toporek's Expert Witness

As part of preparation for trial, Toporek hired Arthur H. Cobb, a Certified Public Accountant (CPA).  Cobb prepared a report in which he "estimate[d] financial damages, including commissions, back pay, and front-pay" stemming from Toporek's claims.  (Cobb Rep., Docket No. 67-2 at 2–5.)  Cobb has assisted and testified in many other cases as a CPA regarding economic damages.  (*Id.* at 5.)

### II.      PROCEDURAL HISTORY

Toporek initiated this case in state court, and RRD filed a notice of removal on January 2, 2024.  (*See* Docket No. 1.)  Toporek filed an Amended Complaint on April 1, 2024.  (Docket No. 13.)  On August 25, 2025, RRD filed a Motion to Exclude Expert Witness Testimony and a Motion for Summary Judgment.  (*See* Docket Nos. 63, 78.)

**DISCUSSION**

**I.    RRD'S MOTION FOR SUMMARY JUDGMENT**

Toporek's Amended Complaint brings 12 counts against RRD: (1) Breach of Contract; (2) Breach of the Covenant of Good Faith and Fair Dealing; (3) Violation of Minn. Stat. § 181.101; (4) Violation of Minn. Stat. § 181.03; (5) Violation of Minn. Stat. § 181.13; (6) Violation of Minn. Stat. § 181.145; (7) Violation of Minn. Stat. § 181.032; (8) Violation of Minn. Stat. § 181.932; (9) Violation of Minn. Stat. § 181.964; (10) Promissory Estoppel; (11) Unjust Enrichment; and (12) Procuring Cause.  (Compl. 7–15.)  RRD seeks summary judgment on all counts.  The Court will address each in turn.

**A.    Standard of Review**

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the lawsuit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

B.        **Count 1: Breach of Contract**

Toporek alleges that RRD breached the parties' contract when it failed to pay her the full amount of commission she was owed on the Pearson project.  Under Minnesota law, the elements of breach of contract are: "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant." *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011).  Toporek claims that she "was paid less than she was owed under her employment contract," constituting a breach.  (Compl. ¶ 49.)  RRD seeks summary judgment on Toporek's breach-of-contract claim, arguing that the Plan provided RRD with the sole discretion to alter Toporek's commission rate, that RRD did so, and that RRD paid Toporek what she was owed under the commission rate that RRD chose.

The Plan clearly provides RRD with some level of discretion to alter commission rates.  The Plan states:

> In the sole discretion of Sales Management, Commission Modifiers may be applied periodically to increase or decrease the final commission of particular products or programs.

(Plan at 18.)  But numerous disputes of fact remain as to whether a breach of contract occurred in this case.  For example, the Plan provides that the commission rate a sales representative receives for a certain project "will be the **rate in effect** at the time the Invoice is received into the [compensation management] platform."  (Plan at 11 (emphasis added).)  Critically, the parties dispute what commission rate was "in effect"— 18%, 12%, or 9%—at the relevant points in time in this case.  Moreover, even if RRD is

correct that the rate "in effect" was 9%, there appears to be a dispute of fact regarding whether Toporek was in fact paid that full 9% in commission.[5]  These disputes must be resolved to determine whether the rate that Toporek ultimately received comported with the contract, a fact that will likely be dispositive to whether a breach of contract occurred in this case.

The parties raise several additional disputes regarding the proper construction of the language of the Plan.  "To interpret the terms of a contract under Minnesota law, a court must initially determine whether a contract term is ambiguous." *Porous Media Corp. v. Midland Brake, Inc.*, 220 F.3d 954, 959 (8th Cir. 2000).  "A contract term is ambiguous if it is reasonably susceptible to more than one interpretation." *Id.*  Although "[t]he meaning of an unambiguous contract is a matter of law for the court . . . the meaning of an ambiguous contract term is a fact question for the jury." *Id.*  "Summary judgment is inappropriate where terms of a contract are at issue and those terms are ambiguous or uncertain." *Bank Midwest, Minn., Iowa, N.A. v. Lipetzky*, 674 N.W.2d 176, 179 (Minn. 2004).

Toporek argues several provisions in the plan are ambiguous.  For example, as to the Plan language discussed in the previous paragraph, Toporek argues the words "rate

---

[5] At the hearing before the Court, when asked "Was [Toporek] paid the full nine percent . . . ?"  Plaintiff's counsel responded, "There's a fact issue on that," referencing Mr. Cobb's expert report that "indicates that she was paid about eight percent rather than the full nine percent."

in effect at the time the Invoice is received into the [compensation management] platform" are ambiguous, because the Plan does not explain how an invoice is "received" into platform or what factors are determinative of what commission rate was "in effect" at that time.  The parties also disagree as to what steps the Plan required RRD to take before it could change Toporek's commission rate—Toporek relies on language in the Plan stating:

> Certain [account numbers] that Sales Management decides need a special rate, may be added to a table in [the compensation management platform].  The Special Rate will be applied until Sales Management decides the Account may be removed from the table. . . .  Sales Management will notify the [employee] prior to an Account being put in this table.

(Plan at 18–19.)  Toporek argues that these conditions—adding the Pearson project to a special table, and notifying Toporek—never happened, and therefore RRD was not entitled to modify her baseline commission rate.  RRD, in turn, argues that these provisions of the contract are not mandatory, relying on the language that RRD "may" add projects to the special table.

The Court finds that these provisions of the Plan are susceptible to multiple reasonable interpretations, and are therefore ambiguous.  Read in its entirety, the "Modifiers" section of the Plan could be read as requiring RRD to place a project in the special "table," and to notify the relevant employee prior to altering the commission rate for that project.  However, it is also reasonable to interpret the Plan as RRD does—that such steps could, but need not, take place.  Furthermore, the Court concludes that the

meaning of the provision stating that each employee must receive the "rate in effect at the time the invoice is received" is susceptible to multiple reasonable interpretations as applied to this case. The meaning of these ambiguous provisions are questions of fact that the Court cannot resolve at summary judgment.

For all of these reasons, the Court concludes that questions of material fact remain as to whether RRD breached its contract with Toporek by not paying the amount she was entitled to under the Plan for her work on the Pearson project. The Court will therefore deny RRD's motion for summary judgment on Toporek's breach of contract claim.

### C.    Count 2: Breach of the Covenant of Good Faith and Fair Dealing

Toporek brings a claim for a breach of the "covenant of good faith and fair dealing" (Compl. ¶¶ 54–57), but the Minnesota Supreme Court has not recognized the existence of such a covenant in employment contract matters. *See Hunt v. IBM Mid Am. Emp. Fed. Credit Union*, 384 N.W.2d 853, 858 (Minn. 1986) ("[W]e have not read an implied covenant of good faith and fair dealing into employment contracts."). Regardless, Toporek concedes that Count 2 is only relevant if the contract is illusory. Because the Court finds the Plan to be a valid contract, the Court will grant RRD's motion for summary judgment as to Count 2.

### D.    Count 3: Minnesota Statutes section 181.101

Toporek alleges that RRD violated Minn. Stat. § 181.101, which provides:

> [E]very employer must pay all wages, including salary, earnings, and gratuities earned by an employee at least once

-14-

> every 31 days and all commissions earned by an employee at least once every three months, on a regular payday designated in advance by the employer regardless of whether the employee requests payment at longer intervals.

Minn. Stat. §181.01(a).  The statute further "provides a substantive right for employees to the payment of wages, including salary, earnings, and gratuities, as well as commissions, in addition to the right to be paid at certain times."  *Id.*  Toporek alleges that by failing to pay her the commission she was owed under the Plan, RRD violated this statute.  (Compl. ¶ 58–60.)

For the same reasons that RRD's motion will be denied as to Toporek's breach-of-contract claim, the Court concludes that disputes of material fact remain as to whether Toporek received the commissions she was entitled to under the Plan.  If Toporek did not receive her owed commissions under the Plan, Toporek would have a valid claim under Minn. Stat. § 181.101.  The Court will therefore deny RRD's motion for summary judgment on Count III.

### E.    Count 4: Minnesota Statutes section 181.03

With respect to Count IV, Toporek alleges violations of two different subdivisions of Minn. Stat. § 181.03.  Subdivision 1 states:

> An employer may not, directly or indirectly and with intent to defraud:
>
> (1) cause any employee to give a receipt for wages for a greater amount than that actually paid to the employee for services rendered;

(2) directly or indirectly demand or receive from any employee any rebate or refund from the wages owed the employee under contract of employment with the employer; or

(3) in any manner make or attempt to make it appear that the wages paid to any employee were greater than the amount actually paid to the employee.

Toporek argues that RRD violated this provision when it entered Toporek's commission rate as 18%, altered it to 12%, and then to 9%.

However, Toporek has not alleged a factual basis upon which it could be shown that RRD's changes to the commission rate were done "with intent to defraud" as required by the statue.  The Court will therefore grant RRD's motion for summary judgment with respect to Minn. Stat. § 181.03, subd. 1.

Toporek also alleges violation of Minn. Stat. § 181.03, subd. 6, which states:

An employer shall not discharge, discipline, penalize, interfere with, threaten, restrain, coerce, or otherwise retaliate or discriminate against an employee for asserting rights or remedies under this section, [or] section[] . . . 181.01 . . . including, but not limited to, filing a complaint with the department or telling the employer of the employee's intention to file a complaint.  In addition to any other remedies provided by law, an employer who violates this subdivision is liable for a civil penalty of not less than $700 nor more than $3,000 per violation.

The Court concludes that genuine disputes of material fact remain as to Toporek's claim under Minn. Stat. § 181.03, subd. 6.  Toporek presents evidence that her superiors brought about her termination as retaliation for her seeking the commission rate which she maintains she was owed under the Plan.  This evidence includes the language of the

-16-

"Memorandum of Understanding" Hoffoss requested that Toporek to sign, which stated, "[y]our continued questioning and negative remarks about your compensation plan are not productive and are unnecessary," and that "[c]ontinued deficiencies may result in additional counseling, up to and including termination." (Kirscher Decl., Ex. C, Docket No. 120-1 at 12.). While RRD strenuously contends that there were ample reasons to support her discharge, Toporek's evidence seems to at least present a factual dispute to be resolved by a jury. The Court will therefore deny RRD's motion to dismiss on Toporek's claim under Minn. Stat. § 181.03, subd. 6.

### F.    Count 5: Minnesota Statutes section 181.13

Minn. Stat. § 181.13 imposes penalties where, after an employee is discharged and makes a written demand for wages and commissions earned, "the employee's earned wages and commissions are not paid within 24 hours after demand, whether the employment was by the day, hour, week, month, or piece or by commissions." Toporek alleges that she "demanded in writing that [RRD] pay her the full amount of her earned commissions," and that RRD did not do so, in violation of this section. (Compl. ¶ 71–75.) RRD responds that this statute requires an employee to make a written demand for wages **after** discharge, which Toporek did not do. RRD also points out that Toporek did not offer any arguments opposing the motion for summary judgment on Count V in her opposition memorandum.

Toporek has failed to establish that she made a demand in writing for her commissions owed after she was discharged, which is required under Minn. Stat. § 181.13. Thus, the Court will grant RRD's motion for summary judgment on Count 5.

### G.    Count 6: Minnesota Statutes section 181.145

Toporek's Amended Complaint alleges a claim under Minn. Stat. § 181.145, but in her memorandum opposing RRD's motion for summary judgment, Toporek "concedes that § 181.145 is inapplicable and therefore withdraws Count [6]." The Court will therefore grant RRD's motion for summary judgment with respect to Count 6.

### H.    Count 7: Minnesota Statutes section 181.032

Minn. Stat. § 181.032(a) requires employers, "[a]t the end of each pay period," to "provide each employee an earnings statement, either in writing or by electronic means, covering that pay period." Toporek argues RRD violated two parts of § 181.032. First, part (b) requires employers to inform employees of "the rate or rates of pay and basis thereof, including whether the employee is paid by hour, shift, day, week, salary, piece, commission, or other method." Minn. Stat. § 181.032(b)(2). Second, part (f) requires that "[a]n employer must provide the employee any written changes to the information contained in the notice under paragraph (d) prior to the date the changes take effect." Minn. Stat. § 181.032(f).

The Court concludes that genuine disputes of material fact remain as to Toporek's claims under § 181.032. As to part (b), Toporek argues that RRD "failed to provide

[Toporek] with the required earnings statements because the information provided . . . in [the] pay stubs . . . did not adequately explain the amounts" Toporek was paid.  (Compl. ¶ 81–83.)  And under part (f), she argues that RRD "changed the basis of [Toporek's] compensation by reducing the commission percentage that was originally set forth in writing pursuant to Minn. Stat. § 181.032(d) without giving [Toporek] the prior written notice required by Minn. Stat. § 181.032(f)."  (*Id*. ¶ 84.)  Regarding part (b), the Court concludes that issues of fact remain as to whether Toporek's pay or other compensation statements were sufficiently specific to comply with the statute.  And on part (f), while RRD contends that no prior notice was required in this case because RRD's right to alter the commission rate was built into the contract, it is disputed whether RRD comported with the terms of the Plan when it changed Toporek's commission rate.  The Court will deny RRD's motion for summary judgment as to Count 7.

I.      **Count 8: Minnesota Statutes § 181.932**

Minn. Stat. § 181.932 provides that "[a]n employer shall not discharge, discipline, penalize, interfere with, threaten, restrain, coerce, or otherwise retaliate or discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because . . . the employee . . . in good faith, reports a violation . . . of any federal or state law or common law . . . ."  Minn. Stat. § 181.932, subd. 1(1).  The elements of a prima facie case of retaliation under this statute are "(1) statutorily-protected conduct by the employee; (2) adverse employment action by the

-19-

employer; and (3) a causal connection between the two." *Cokley v. City of Otsego*, 623 N.W.2d 625, 630 (Minn. Ct. App. 2001) (quoting *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 444 (Minn. 1983)). To establish protected conduct under § 181.932, a plaintiff must show that she reported facts that, "if proven, would constitute a violation of law." *Abraham v. Cty. of Hennepin*, 639 N.W.2d 342, 355 (Minn. 2002).

RRD argues that Toporek cannot establish any of the elements required for a prima facie claim under § 181.932. The Court disagrees. First, as discussed previously, the Court finds that disputes of fact remain as to whether RRD's failure to pay Toporek the full commission rate she claims she was owed constituted a violation of Minnesota law. Accordingly, Toporek's complaints of such conduct could plausibly constitute a report of unlawful conduct protected by the statute. Furthermore, Toporek's allegations related to her discharge would, if true, support her claim that she suffered an adverse employment action causally connected to her report. It may well be that RRD can ultimately establish legitimate justifications for her termination; but those disputes of fact cannot be resolved at summary judgment. The Court will therefore deny RRD's motion for summary judgment on Toporek's claims under Minn. Stat. § 181.932.

### J.    Count 9: Minnesota Statutes section 181.964

Minn. Stat. § 181.964 prohibits employers from retaliating against employees "for asserting rights or remedies provided in sections 181.960 to 181.965." Toporek alleges that her refusal to sign the "Memorandum of Understanding" presented to her by Hoffoss

was an exercise of her rights under Minn. Stat. § 181.962—which allows an employee to "dispute[] specific information contained in the employee's personnel record."

RRD argues that Minn. Stat. § 181.962 merely prescribes procedures for handling personnel disputes but that it does not in itself create an independent right to dispute personnel record information.  RRD argues further that, even if the statute does create such a right, Toporek's mere refusal to sign the memorandum did not constitute an assertion of that right, such that the retaliation provision of § 181.964 is implicated.

The Court concludes that genuine disputes of material fact remain as to whether Toporek's conduct amounted to an "assert[ion] [of] rights or remedies provided in sections 181.960 to 181.965," such that RRD's firing of Toporek implicated the retaliation provision of § 181.964.  Furthermore, while Toporek's allegations of violations of § 181.962 may ultimately be shown not to give rise to a claim under § 181.964, at this stage RRD has failed to prove as much as a matter of law.

Accordingly, the Court will deny the motion for summary judgment as to Count 9.

### K.    Counts 10–12: Promissory Estoppel; Unjust Enrichment; Procuring Cause

Counts 10 through 12 bring equitable claims under the doctrines of Promissory Estoppel, Unjust Enrichment, and Procuring Cause.  Because the Court concludes that the Plan is an enforceable contract, and because Toporek conceded at oral argument that Counts 10 through 12 should be dismissed should the Court reach such a conclusion, the Court will grant RRD's motion for summary judgment as to those counts.

## II.    DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY

### A.    Standard of Review

Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides the following:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The district court has a gate-keeping obligation to make certain that all testimony admitted under Rule 702 satisfies these prerequisites and that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). The proponent of the expert testimony has the burden of establishing by a preponderance of the evidence that the expert is qualified, that his or her methodology is scientifically valid, and that "the reasoning or methodology in question is applied properly to the facts in issue." *Marmo v. Tyson Fresh Meats, Inc.*,

457 F.3d 748, 757–58 (8th Cir. 2006).  Expert testimony is inadmissible if it is "speculative, unsupported by sufficient facts, or contrary to the facts of the case."  *Id.* at 757.

A "trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  However, the Eighth Circuit has held that "[c]ourts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility."  *Marmo*, 457 F.3d at 758.  "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."  *Loudermill v. Dow Chem. Co.*, 863 F.2d 566, 570 (8th Cir. 1988).  "Only if [an] expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."  *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929–30 (8th Cir. 2001) (quoting *Hose v. Chi. Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1996)).

**B.    Analysis**

Toporek seeks to present as evidence a report compiled by Certified Public Accountant Arthur H. Cobb.  This report presents a "preliminary analysis of business and financial documents and information to develop methods to estimate financial damages, including commissions, back pay, and front-pay, and to estimate financial damages of Dorota Toporek."  (Cobb Rep., Docket No. 67-2 at 6.)

RRD argues that the Court should exclude Cobb's report under Rule 702 for several reasons. RRD contends that: (1) Cobb analyzes portions of the Plan that are irrelevant to this case; (2) Cobb lacks training to opine on the printing business; (3) Cobb did not have enough data to opine on RRD's business decisions; (4) Cobb's methodology simply accepts Toporek's version of events as true, and is therefore unreliable; (5) Cobb offers inadmissible legal conclusions; and (6) Cobb made calculation errors that render his report unhelpful to the jury.

Exclusion is not warranted on any of these grounds. First, "Rule 702 does not require perfect symmetry between an expert's experience and the precise subject matter of their testimony . . . . Rather, the relevant inquiry is whether the expert's background equips him to help the jury understand the facts or issues in dispute." *Minnesota v. Fleet Farm*, 2025 WL 2802243 at *6 (D. Minn. Oct. 1, 2025); *see also Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006). The Court concludes Cobb's background is sufficient to qualify him to opine on the issues in this case. Furthermore, although expert witnesses may not opine on legal matters, expert "testimony is not defective because it utilize[s] the words of the legal standard." *United States v. Kelly*, 679 F.2d 135, 136 (8th Cir. 1982). If Cobb does not offer legal instructions to the jury, his expert testimony is admissible. And finally, regarding other issues such as portions of Cobb's report that may be irrelevant, lack sufficient factual basis, or have minor rounding errors, the Court concludes that such issues are best left to cross-examination, and do not rise to such a

-24-

level that exclusion is warranted. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Accordingly, the Court will deny RRD's motion to exclude.

## CONCLUSION

The Court will grant in part and deny in part RRD's motion for summary judgment. The Court concludes that genuine issues of material fact preclude summary judgment on Count 1 (Breach of Contract), Count 3 (Minn. Stat. § 181.101), Count 4 (as to Minn. Stat. § 181.03, subd. 6), Count 7 (Minn. Stat. § 181.032), Count 8 (Minn. Stat. § 181.932), and Count 9 (Minn. Stat. § 181.964). The Court will grant RRD's motion for summary judgment as to the remaining counts in Toporek's Complaint. Additionally, the Court will deny RRD's Motion to Exclude Expert Testimony, finding the testimony to be admissible under Rule 702.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion for Summary Judgment (Docket No. [78]) is **GRANTED in part** and **DENIED in part** as follows:

    a. **DENIED** as to Count 1, Count 3, Count 4 (as it relates to Minn. Stat. § 181.03, subd. 6), Count 7, Count 8, and Count 9.

b. **GRANTED** as to Count 2, Count 4 (as it relates to Minn. Stat. § 181.03, subd. 1), Count 5, Count 6, Count 10, Count 11, and Count 12.

2. Defendant's Motion to Exclude Expert Testimony (Docket No. [63]) is **DENIED**.

**IT IS FURTHER ORDERED** that this Order shall be filed under seal.  The parties must show cause on or before five business days from the date of this Order why the Court should not unseal the Order and shall specify any portion of the Order warranting redaction.  The Court will determine whether continued sealing or suggested redactions are warranted.

DATED:  March 31, 2026                          _____/s/ John R. Tunheim_____
at Minneapolis, Minnesota.                          JOHN R. TUNHEIM
                                                United States District Judge